UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

UNITED STATES OF AMERICA,

14 CR. 123 (VSB)

-against-

ISHITA GANGULY,
                 Defendant.
━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

**SENTENCING MEMORANDUM ON
BEHALF OF DEFENDANT ISHITA GANGULY**

THOMAS A. TORMEY, JR.
Attorney for Defendant
*Ishita Ganguly*
140 Broadway
46th Floor
New York, New York 10005
(212) 480-3910
*T.Tormey@TormeysLaw.com*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT…………………………………………   1

STATEMENT OF FACTS ……………………………………………...   2

    A.     Personal Background ………………………………………   2

    B.     Circumstances of Ishita's Involvement in the Offense …….   5

    C.     Ishita Ganguly's Character …………………………………   8

    D.     Ishita Ganguly's Psychiatric Condition ……………………   14

    E.     Ishita Ganguly's Agreement to Provide Restitution ………..   16

ARGUMENT

       THE COURT SHOULD IMPOSE A NON-CUSTODIAL SENTENCE
       OR A SENTENCE SUBSTANTIALLY LESS THAN THE
       41 MONTHS RECOMMENDED BY PROBATION

    A.     The Applicable Legal Principles …………………………..   18

    B.     Sentencing Disparities for Similarly Situated Defendants …   20

          1.  The Madoff Defendants ………………………..   20

          2.  United States v. Saquib Kahn, 13-Cr-00268 ……   22

    C.     A Sentence to Reflect the Seriousness of the Offense,
       to Promote Respect for the Law and to Provide Just
       Punishment for the Offense …………………………………   23

    D.     To Afford Adequate Deterrence to Criminal Conduct
       and to Protect the Public form Further Crimes of the
       Defenant …………………………………………………..   24

    E.     The Extent of Ishita Ganguly's Involvement and Her
       Efforts to Make the Victims Whole …………………………   25

F.      In this Case, Incarceration is Not Necessary
        To Accomplish the Purposes of Sentencing
        As Set Forth in 18 U.S.C. 3553(a)(2) …………………………        27

G.      Confinement, If Required, To Be at FPC Alderson,
        West Virginia …………………………………………………..        28

H.      Voluntary Surrender …………………………………………        29


CONCLUSION …………………………………………………………        30

## PRELIMINARY STATEMENT

The defendant, ISHITA GANGULY ("Ishita", "Ganguly" or "defendant") stands before this Court for sentencing, having pled guilty to Count One of the indictment that charges her with securities fraud in violation of Title 15, United States Code, Sections 78j(b) and 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18 United States Code, Section 2.

The presentence report dated December 18, 2014 ("PSR") describes the violations of the securities laws committed by the defendant. It does not describe why or how Ishita Ganguly became involved in this case. This memorandum will attempt to explain, at least in part, why Ishita Ganguly, a 32 year old young woman with a Masters degree in finance, with really no criminal record to speak of and certainly no criminal involvement in anything that might constitute fraud or misrepresentation prior hereto, did what she did and why this court should sentence her to less than the 41 months minimum sentence provided for by the Sentencing Guidelines and recommended by the Probation Department. It will also explain why a non-custodial sentence is "sufficient … to fulfill the purposes of sentencing. *See, United States v. Cavera,* 550 F. 3d 180 (2d Cir. 2008) (*en banc*), *cert denied,* 556 U.S. 1268 (2009), *quoting* 18 U.S.C. § 3553(a).

## STATEMENT OF FACTS

### A.  Personal Background

To an outsider, it may appear as if Ishita Ganguly was born into a perfect family. Her father, Jyoti Ganguly, was a cardiologist and a cardiothoracic surgeon (PSR:9) with a successful practice in Long Island.  Ishita's mother was also a physician specializing in nephrology. (PSR:9)  Together, Ms. Ganguly's mother and father were able to seemingly provide Ishita and her sister, Sonali, with the perfect family along with a comfortable home in a wonderful area on Long Island, known as Dix Hill.  (PSR:10).  Being born to two successful parents and living in a beautiful area of Long Island seems like the perfect life.

Unfortunately, however, nothing is ever as it seems.

When Ishita was only about a year old, her maternal uncle became very sick with juvenile onset diabetes and was rendered virtually blind.  *See, Exhibit F, p. 2.* Ishita's mother took responsibility for her brother's care but was unable to perform this function while simultaneously taking care of her own two young children.  Caring for her brother combined with the care of Ishita's older sister apparently placed an incredibly large burden on Ishita's mother who was having much difficulty handling the load that this placed on her life.

So, in an effort to unburden herself and relieve some of the responsibility she was shouldering, Ishita's mother and father decided to ship Baby Ishita off when she was only a year old to live in India with her grandmother and an aunt.  Ishita lived in India for the

2

next five years until she was approximately six years old.  Growing up in India, Ishita learned to speak Hindi and Bengali before she learned to speak English.  Finally, at about the age of 6, Ishita was allowed to return home to live with her family.  (PSR: 10)

Shortly after returning home, however, problems began to surface.  Ishita was having difficulty in Crestwood Country Day School as a kindergartner because of her lack of fluency in English and her family was required to take her out of that school. *Exhibit F, p. 2.*  Then, when Ishita was only seven years old, Ishita's father left her mother and his two children after having an extramarital affair.  (PSR: 10) The breakup and subsequent divorce was protracted and bitter and although Ishita's dad attempted to obtain custody of his two children, Ishita and her sister remained with their mother.  After that, Ishita's dad had little contact with his family and was rarely involved in the care or upbringing of his daughters.  Ishita's mother continued to work as a physician and Ishita and her sister essentially grew up as "latchkey" children.  (PSR:10).

After high school, Ishita began her college education by attending NYU. Unfortunately for Ishita, however, she had to withdraw when her father, who initially agreed to pay for her college education, acquiesced to the wishes of his new wife and refused to pay for her tuition. *See, Exhibit F, p. 2.*  As a result, Ishita withdrew from NYU and enrolled in Baruch College from where she graduated with a Bachelors degree in Business Administration and a Masters degree in Finance.

Upon graduation, Ishita began working in the financial industry.  Ms. Ganguly started out working as an intern, first at AXA Equitable and then at SAC Capital. Eventually, Ms. Ganguly obtained a full-time position with Sailfish Capital.

Shortly after entering college, Ishita's mother was diagnosed with ovarian cancer. Even though Ishita was aware that her own mother sent her away when she was just an infant, Ishita wanted to take care of her mother.   So, together with her sister, Ishita Ganguly assumed the role of caregiver to her mother. Ishita frequently brought her mother to her medical appointments and her chemotherapy treatments, which began to take a toll on Ishita.  Ishita was the daughter that was shipped off when things got difficult and now she, herself, felt the strain of caring for a mother who found it difficult to care for her.  This was a very large burden for a young woman to bear and it resulted in much time lost from school and her studies.

The treatment from the physicians helped the cancer go into remission for a period of years until 2005 when Ishita's mother suffered a serious downtown.  In 2005 the cancer returned and Ishita's mother began to fail rapidly.  Ishita's mother was dead within a year. (PSR:9)

While in college and during the time that her mother was being treated for cancer, Ishita met and began dating James Mark Morrison ("Morrison").  Morrison was a sophisticated businessman who from 1992 to 2000 was the President of L'Oreal cosmetics and hair care company.  (PSR: 11 and *see, Lucire.com,* The Revolutionary, Issue 21 attached as *Exhibit B*.) When Morrison met Ishita, he had already left L'Oreal and was then the owner of an upscale spa located in downtown Manhattan.  Ishita immediately fell for Mr. Morrison who was likewise seriously attracted to Ishita, despite the fact that he was 20 years older than her.

In 2002, Ishita moved in with Morrison and the couple lived in New Canaan, Connecticut.  In 2004, Jim Morrison asked Ishita to marry him and on August 8, 2008, they were wed.  (PSR:10)

Ishita and her husband were living a good life.  They had money and property. They were frequent contributors to charity and were often honored for their contributions to cancer research.  *See, Exhibit C.*  They had a house in Connecticut, a house in Florida and a house in California. (PSR:10)  Ishita and her husband became the owners of Sexy Hair Beauty Products and together they purchased Bosely Hair Care.  As the couple spent more and more time on the west coast, Ishita left her job at Sailfish Capital and took a job selling real estate in California.  Life seemed very good.  But unfortunately for Ishita, she would once again feel the pain of abandonment as she had twice before when she was just a little girl.

Morrison took to drinking and at times he became physically abusive with Ishita. (PSR:10)  At some point, Morrison had an affair and Ishita decided to seek a divorce. Ishita moved back to the east coast and began the process of ending her marriage. Unfortunately for Ishita, nearly all of the couple's money was tied up in real estate and the two businesses the couple owned and Ishita found out just how difficult it was going to be to live on very little until the companies could be evaluated and the proceeds eventually distributed; a process that still has yet to happen.

**B.  The Circumstances of Ishita's Involvement in the Offense.**

Upon her separation from Morrison, Ishita began to struggle.  Alone and financially strapped, Ishita began to search for a job back here on the East Coast.  At

some point during her employment search, a real estate client of Ishita's living in

California introduced her to another wealthy businessman.  This man, Paul D. Phillips,

was an eloquent, wealthy British entrepreneur with a golden tongue.[1]

Phillips spoke to Ishita about the tremendously large financial endeavors he was

supposedly pursuing and at some point, Phillips convinced Ishita that she should work for

him as an employee.  This began their relationship and Ms. Ganguly began performing

basic tasks at the request of Phillips, such as vetting possible investors for Phillips to

contact.

Despite Ms. Ganguly's repeated requests for payment for the work she was

performing, or a contract formalizing her employment, knowing what we know now, it is

not surprising that Phillips never provided either one to Ms. Ganguly.  Instead, Phillips

convinced Ms. Ganguly that he wanted her to become his partner on some extraordinary

projects that would generate great wealth for the both of them.  Paul Phillips was

extraordinarily convincing and when he actually paid Ishita over two million dollars early

on in their relationship for what seemed like a relatively small amount of work, Ishita was

hooked.

Ishita totally believed Phillips's convincing lies.  Ishita willingly began to work

with Phillips and whenever she expressed any doubts about the investment scheme,

---

[1] As the emails and text messages provided by the prosecution clearly demonstrate, Paul D. Phillips was extremely persuasive.  Not only did Phillips convince the investors to give him millions of dollars, Phillips was even able to convince one of the victims, Denis Graf, that his scheme was genuine despite the expressed reservations by Graf about the legitimacy of the investment. Graf, fearing that he was being victimized by Phillips, insisted on meeting with Phillips in London.  Phillips agreed.  Despite Graf's earlier threats of legal and criminal action, after the parties met in London, numerous emails between the parties reveal that the alleged investment plan was supposedly back on track and that Graf had decided that Phillips was a legitimate businessman with good intentions.  In fact, Graf told Phillips in a text message on September 8, 2012, "Moreover for me, your word and the handshake last visit I was in London has more value than any contract."  *Government Discovery Exhibit p. 3478, attached hereto as Exhibit D*.  Clearly, Phillips was an expert at convincing people that he was legitimate and that they would all receive tremendous returns on their investments and for their labors.

Phillips would belittle her by telling her that she just didn't understand the finances. Whenever this occurred, all questioning would cease.

While the prosecution may question Ishita's assertion that she believed that the scheme proposed by Paul Phillips was legitimate, it is clear that Ishita was not the only person who believed in Phillips's lies.

Two of the victims, Seth Kanegis and James Campbell were wealthy, sophisticated businessmen who delivered one million dollars each of their own money to Ishita based on the representations of Paul Phillips. Indeed, Seth Kanegis was not only a sophisticated businessman, he was, years before, one of the top traders at SAC Capital who amassed great wealth and fame from his participation in complex economic transactions. If Paul Phillips could convince these two men that the investment scheme was legitimate, then it is just as reasonable for a young lady suffering from the strain of a failing marriage and the accompanying financial hardships to believe in him as well.

Then it happened. In need of money, feeling alone and vulnerable, Ishita decided that instead of waiting for the investment scheme to run its course, she would use some of the money the investors gave her for her own personal gain. She convinced herself that when the investment finally paid off she would repay the clients the money that she took and which the investors believed was being invested.

Instead of investing all of the client's money, Ishita sent just a portion of it to the attorney trust account as directed by Phillips and then she took her share of the profits off the top.

As everyone knows, however, this is an improper diversion of client's funds even if the scheme were legitimate. To make matters worse, here there were no profits

because the scheme turned out to be a complete fraud and the investors never saw their money again.

Even though Ms. Ganguly may have believed that she would be able to repay this portion to the investors, she knows that what she did was wrong.  Unfortunately for Ishita, the pain of the separation, the financial difficulty she was experiencing, combined with the lure of large amounts of easy money promised by the smooth talking Paul Phillips, led Ishita Ganguly to do something that she would ordinarily not have done.

For those reasons, Ishita Ganguly has admitted her guilt and accepted responsibility for her actions.  She is in the process of liquidating all of her assets and has personally taken steps to sell the house she purchased with some of the money she took so that she can repay those people who lost their investments.  *See, Exhibit E, Letter from Dorene Marino of Robert DeFalco Realty regarding the steps being taken by Ms. Ganguly to sell the house in order to provide restitution to the victim.*


**C. Ishita Ganguly's Character.**


Despite being abandoned by or being separated from people she loved on three separate and distinct occasions in her life, Ishita Ganguly always tried to remain positive. Although quiet and reserved, Ishita has had the good fortune of making a few close friends in her life.  These friends were stunned by her arrest and prosecution but even more so by her admission of wrongdoing, simply because such acts are so totally out of character for Ishita.

Ms. Ganguly's friends believe in her and they have had the benefit of her kind and generous spirit. Several of them have provided letters of support, which are submitted with this memorandum. These letters demonstrate that Ms. Ganguly is not an evil person or someone motivated by greed but rather a good, decent, honest and caring person who obviously succumbed to the pressures in her life and did something neither she nor anyone else could have believed was possible.

As John Anderson, a retired NYPD Detective, 2nd Grade, writes, in part:

. . .

> Throughout the past seven years, Ishita and I have become and remain close personal friends and I would like to take this opportunity to explain to you the character and integrity of Ishita. Ms. Ganguly, for the duration of our friendship, has always been a very caring and loving person who has helped me through several personal tragedies. She has dropped everything on certain occasions just to be a good friend and comfort me in my time of need. I have personally witnessed her charitable works, both publicly and privately on several occasions.

> I can clearly and unequivocally state that Ishita Ganguly possesses the highest moral standards and unshakeable level of integrity not found in many people. If there is any fault I can find within Ishita, it is that she is sometimes to trusting; this has become abundantly evident in her professional relationship with Mr. Paul D Phillips. Regardless of her relationship with Mr. Phillips, the allegations leveled by the Federal Prosecutors Office are serious, but as it relates to Ishita, I know she is doing everything she can to rectify the situation. She has said many times she wants to make things right. I can see the remorse in her eyes and would like to state that Ishita is a sweet, kind and trusting person. This whole experience has been tough on her, but I see her pushing through and doing everything to make things right. I witnessed her selling her house and her possessions to make the victims whole. I hope that this letter at least gives you a bit of insight into the kind, caring and sweet woman I know and have grown close to.
> . . .

Letter of John R. Anderson, *Exhibit A-1*.

Although the court may question how Mr. Anderson can state that someone who has admitted to taking money from investors for her own personal use can be someone of with the "highest moral standards and unshakeable level of integrity…", I can only say that Mr. Anderson and the other authors of the letters that are attached to this memorandum have seen the true Ishita Ganguly.  No humans are without sin or weakness.  Even the Great Teacher said in defense of the adulterous woman "Let he who is without sin, cast the first stone."  John 8:7.

That quote is not offered as an excuse but as an demonstration that all human beings undergo periods of weakness, temptation and failings.  Ms. Ganguly was suffering from just such a period of weakness.  She was once again separated from people she loved.  She was adrift without the abundance to which she had grown accustomed.  In this moment of weakness and need she had the unfortunate chance of meeting Paul D. Phillips who drew her in with smooth and syrupy promises of wealth while cajoling her with belittling remarks if she ever raised a question about the investment programs.

As another friend, Laura Bergano, writes

> I am writing this letter on behalf of Ishita Ganguly. Through friends and family we met several years ago and over time our friendship grew closer.  We have become best of friends and confidants in our private and professional lives.  Through personal experience I can attest to her holding the highest standards of honesty and integrity that we all strive to achieve. Ishita is the friend we all wish we had, I am fortunate enough to say that I've been enriched by her becoming such a huge part of my life.  She has always been there to lend an ear.
>
> My husband and I have spent countless weekends with her, either at her house or ours.  In the past we have also taken trips together to attend several charity events.  She is always willing to drive an hour and a half to me when she knew I needed a friend.

We to this day speak through phone or text message practically every day.

Ishita puts faith in the fact that everyone she comes in contact with lives by the same high moral standard and integrity that she does, so it's understandable that she could be misled by, Mr. Paul D Phillips, but regardless of that she is taking responsibility and making things right in her way.  I am fully aware of the charges brought against her.  I know that Ishita is doing everything in her power to rectify the situation.  I have personally witnessed her selling her house, holding an open house twice a week since her house has been listed and doing everything she can to market the property in order to get it sold.  She has been selling off many of her dear personal items and possessions and has always attested that she wants to make things right.  I have witnessed her through this whole experience and have many times hear her say that she wants to right the wrongs done to the victims.

. . .

Letter of Laura Bergano, attached as *Exhibit A-2*.


In a letter from Ishita's former boyfriend, Mark Cagnetto, he states

I have known Ishita since October of 2013, and in all my years I have never met someone who is so caring, honest and selfless.  She always puts others ahead of herself, and being the same way myself you could imaging the funny situations that arise between us.  Whether it's opening a door for one another, deciding what movie to rent, what to make for dinner, etc., etc., she is always putting others ahead of herself.  I am totally aware of how silly these things may sound in light of the serious allegations being brought against her by the Federal Prosecutor's Office, but that is just my point.  Kind, honest and trusting people like Ishita are an easy target in a world full of people who don't have a stitch of moral character,  [referring to Paul Phillips], let alone the high moral character and ethical responsibility towards others that Ishita lives her life by every day.  Personally I am inspired by her and feel lucky to have her in my life, and to be a part of hers.  It's heartbreaking to think that someone would victimize Ishita on any level, never mind to the degree of putting her in harms way without her knowledge or participation.  It makes a good person like myself begin to question the world and the intentions and motives of everyone in it.  A feeling of negativity begins to

11

>           overshadow my usual optimistic outlook.  But Ishita is a walking
>           talking reminder of the good that still exists in this world and I am
>           thankful for that.

Letter of Mark T. Cagnetto, *Exhibit A-3*.

Of interest to note is that Mr. Cagnetto continued to stand by Ishita, despite

knowing her for only two months before she was arrested. Mr. Cagnetto was with Ishita

when she was arrested at Kennedy Airport on this case.  At the time of her arrest, the

federal agents immediately separated Mr. Cagnetto and Ms. Ganguly.  The agents then

proceeded to interrogate Mr. Cagnetto about Ms. Ganguly and about their relationship.

Because he only knew Ishita for a short period of time and because of what he had just

been put through at Kennedy Airport, it would have been completely understandable for

Mr. Cagnetto to withdraw from Ishita.  But Mr. Cagnetto did not abandon Ishita.  He has

stayed by her side and supported her throughout this entire proceeding even going so far

as to become one of the sureties on her appearance bond.

Sadly, Ms. Ganguly decided to end their relationship.  As Ms. Ganguly told Dr.

Krueger, she broke off their relationship because she did not think he should associate

with her because of her criminal record.  *Exhibit F, p. 4.*

Sometimes even a short note can be helpful in trying to evaluate a person's

character.  Such is the case with Exhibit A-4, an email from Vicente Galindo. Mr.

Galindo is an individual who knew Ishita from the real estate industry in California in

years past.  Mr. Galindo's note reads:

>           I have known her for years and she was always truthful and
>           a beautiful person to me.  I pray all works out … let her
>           know I love her forever.

Email letter from Vicente Galindo, *Exhibit A-4*.

Significantly, when the undersigned told Ms. Ganguly that I received that email from Mr. Galindo, Ms. Ganguly was shocked.   Ms. Ganguly informed me that she had not spoken to Mr. Galindo in years and no one asked Mr. Galindo to write a letter. Somehow, possibly through the degrading publicity that Ms. Ganguly was forced to endure at that time of her arrest and after her conviction, Mr. Galindo learned about what happened to Ms. Ganguly and he wanted to provide some small but meaningful support to her as she gets ready for this new phase of her life.

Afterwards, Ms. Ganguly contacted Mr. Galindo and thanked him for the kind words.  Following that Mr. Galindo thanked me for passing his message on to Ms. Ganguly.  He reiterated his affection and support for Ms. Ganguly and informed me that when this is all over, he would love to have Ms. Ganguly as his business partner.

As the letters above demonstrate, Ms. Ganguly is a good, kind and decent person. She is clearly not someone who is evil or corrupt.  She has provided support and a caring friendship to many people over the years.   She has supported many charitable organizations both publicly and privately.  *See, Exhibit C, Photograph of Ishita Ganguly and her husband, James Morrison receiving an award from the Concern Foundation for their philanthropic work in fighting cancer.*

In addition, it is also clear that her expressions of remorse are not just an attempt to influence this court but are genuine and true.  Ishita has taken extra steps in an attempt to right the wrong that she did and make the investors whole.

Ishita is a good person who succumbed to pressure and temptation and she did something she would not have ordinarily done.  She has admitted her guilt and she is

sorry for what she has done.  Now, she is making every effort to try and make it right because that too is the kind of person she really is.

## D. Ishita Ganguly's Psychiatric Condition

After her arrest on December 22, 2013, Ishita Ganguly began to spiral downwards, psychologically, until she reached a breaking point in September of 2014. She was unable to sleep.  She was despondent and alone.  She had lost 15 pounds and was drinking half a bottle of wine or more a night.  Ishita Ganguly finally sought professional help from a psychiatrist, Dr. Richard B. Krueger, M.D.  Dr. Krueger is a Board Certified psychiatrist associated with New York State Psychiatric Institute and Columbia University.

Dr. Krueger saw Ms. Ganguly on September 22, 2014, September 29, 2014, October 13, 2014, November 3, 2014 November 17, 2014, December 22, 2014 and January 5, 2015.

In addition to interviewing Ms. Ganguly, Dr. Krueger was provided with a copy of the complaint against Ms. Ganguly and a copy of the pre-sentence report.  Following his interviews and a review of the materials, Dr. Krueger prepared a report on the psychiatric condition of Ms. Ganguly that is attached hereto as Exhibit F.

This is not the first time Ms. Ganguly has had the need for psychiatric consultation.  When she was 7 years old, after returning from having been sent away to India by her parents and shortly after her parents separated due to her father's infidelity, Ms. Ganguly was treated by a child psychologist in Commack, New York.  *Exhibit F, p.*

*2.* In early grade school, Ms. Ganguly suffered from an eating disorder that required hospitalization although she did not receive psychiatric counseling at this time. *Exhibit F, p. 2.* Then in 2009, Ms. Ganguly was hospitalized psychiatrically in Los Angeles for exhaustion and a 40-pound weight loss. She had also been drinking heavily. *Exhibit F, p. 3.*

Dr. Krueger diagnosed Ms. Ganguly

REDACTED

She does not have a history of prior arrests and her risk for future criminal behavior as assessed by the Hare Psychopathy Checklist and the Level of Service/Case Management Inventory is low."

### E.  ISHITA GANGULY'S AGREEMENT TO PROVIDE RESTITUTION TO THE VICTIMS OF HER ACTIONS.

When being interviewed by Probation Office following her plea of guilty, Ishita Ganguly stated to P.O. James Mullen, "I feel terrible about my conduct.  I will do everything and anything to fix what I have done.  I want to make things right.  I'm responsible for this.  I want to right my wrongs.  I am very sorry."

These remarks clearly establish that Ishita Ganguly has accepted responsibility for her actions.  Significantly, Ms. Ganguly did not merely state that she "felt terrible" which could be interpreted in a myriad of ways.   Ms. Ganguly stated that she felt terrible about "her conduct."  She was not stating that she felt terrible that she got caught or that she will be punished.  Ms. Ganguly told Officer Mullen that she felt terrible for what she did. She offered no excuses.  After slipping and doing something that was totally out of

FOOTNOTE REDACTED

16

character, she has righted her moral compass.  She was and still is a person of good character who suffered from a misstep but who is now willing to take responsibility for what she has done and try, somehow, to make it better for the people who she hurt.

This Court may remember, that during her plea, Ishita Ganguly, began to sob and needed to sit.  Her emotional breakdown occurred not because she was caught in an illegal act but because she had to admit that she had done something wrong and that she had done something that hurt others.

As part of her plea bargain, Ishita Ganguly has agreed to the forfeiture of her home and practically everything that she owns in order to make the victims of her actions whole.  She has cooperated with the government by attempting to sell her property before she is sentenced.  She has listed her home with a real estate agent and has opened its doors up to the public in an attempt consummate a sale.  *See, Exhibit E.*  She does this knowing that she will not benefit from her actions at all but so that all of the proceeds will be returned to the four individuals who were injured by her conduct.

Instead of sitting back and waiting for the government to do all of the work regarding the sale of the property, Ms. Ganguly has taken this affirmative step so that perhaps her victims may be made whole.

That is yet more evidence of the true character of Ishita Ganguly and the person about whom her friends have written.

## ARGUMENT

### THE COURT SHOULD IMPOSE A NON-CUSTODIAL SENTENCE OR A SENTENCE SUBSTANTIALLY LESS THAN THE 41 MONTHS RECOMMENDED BY PROBATION

#### A.  The Applicable Legal Principles

In *United States v. Booker,* 543 U.S. 220 (2005), the Supreme Court rendered the Sentencing Guidelines "effectively advisory".  *Booker, at 245*.  Since the decision in *Booker* the Second Circuit observed, "[i]t is now … emphatically clear that the Guidelines are guidelines – that is, they are truly advisory.  *United States v. Cavera,* 550 F.3d 180, 189 (2d Cir. 2008)

As a procedural matter, district courts are to use the Sentencing Guidelines as a "starting point and the initial benchmark" when calculating the sentence for each individual defendant.  *Kimbrough v. United States,* 552 U.S. 85, 108 (2007) *quoting, Gall v. United States,* 552 U.S. 38 (2007).  Even though the guidelines are to be considered the starting point for the sentencing court, they are not mandatory on that court.  Further, the Guidelines are not only *not mandatory* on the sentencing court, they are also not to be presumed reasonable.  *See, Nelson v. United States,* 129 S.Ct. 890, 891-892. (2009).  *See, also, Cavera,* 550 F.3d at 189, ("district court may not presume that a Guidelines sentence is reasonable.")

In addition, the Guidelines may not be assigned any presumptive weight over the other factors set forth in Section 3553(a).  *United States v. Verkhoglyad,* 516 F3. 122, 131 (2d Cir. 2008).  Thus, "[d]istrict court judges are, as a result, generally free to impose sentences outside the recommended [Guidelines] range."  *Cavera*  at 189.

*Booker, Gall, Kimbrough* and *Nelson* have effectively restored the district courts' broad discretion by permitting them to impose a sentence considering all of the factors in Section 3553(a) and made the Guidelines just one such consideration.  *United States v. Jones,* 531 F. 3d  163, 173-174 (2d Cir. 2008).

Adhering to *Booker* and *Jones,* Section 2552(a) requires this Court to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in" section 3553(a)(2).  18 U.S.C. §3553(a) in turn, requires this Court to consider the need for the sentence imposed:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. §3553(a)(2).

In addition to the foregoing, 3553(a) requires this Court to consider the nature and circumstances of the offense, and the history and characteristics of the defendant, the kinds of sentences available, the kinds of sentence and the sentencing range established for the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines, the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct and the need to provide restitution to any victims.

Based on all of the foregoing, this court should sentence the defendant, Ishita Ganguly to a non-custodial sentence or to a sentence of no more than 15 months

incarceration, particularly to avoid sentencing disparities among similarly situation defendants.

## B. Sentencing Disparities for Similarly Situated Defendants

The government and the defendant, have stipulated that the appropriate sentencing guidelines range is 41 to 51 months imprisonment.  The Probation Office, after having conducted their investigation recommended the imposition of the bottom end of that range, *i.e.,* 41 months incarceration or approximately 3 ½ years.  As part of the plea agreement, the parties agreed that the defense could request the court to impose a sentence of less than the amount set forth in the Guidelines.  Since the 41 to 51 month range in the Guidelines is an arithmetical calculation based largely on the amount of money taken by Ms. Ganguly, it becomes important to examine her conduct in comparison to other recently sentenced defendants in similar types of cases.  When this is done, it becomes clear that a sentence of 41 months could be viewed as unduly harsh.

### 1. The Madoff Defendants.

Recently, a United States District Judge in the Southern District of New York imposed sentences on a number of defendants who were involved in the largest fraud in history.  Bernie Madoff and his accomplices carried out the largest Ponzi Scheme of all time; a scheme that one federal judge called "extraordinarily evil."  Thousands of people were swindled.

Annette Bongiorno, Bernie Madoff's secretary who played an integral role in the execution of the $64 billion dollar scam, personally amassed $50 million dollars from her participation in the scheme but was sentenced to just 6 years in jail. This defendant was sentenced to only 2 ½ years more than the amount recommended by Probation in our case, despite the incredible magnitude of the losses, the huge sums of money that she took for herself, the huge scale and scope of the fraud, and despite the 20 year recommendation of the Probation Department and the 8 to 10 years of imprisonment requested by her own lawyer.

People lost their life savings to Madoff and his accomplices. Retirees lost their homes and retirement money. Some people were required to seek the protection of the bankruptcy courts. Others were forced to abandon their retirement and return to work in order to pay bills that they believed would have been covered by their investments with Madoff. Some investors were completely wiped out. All of this was occurring while Ms. Bongiorno drove around in expensive cars and purchased a mansion in Manhasset and a $1.3 million dollar condominium at the Boca Beach Club in Florida.

Another of Madoff's accomplices, Mr. Jerome O'Hara, a computer programmer, whose participation in the scheme was essential to its success was sentenced to only 2 ½ years.

Like Ishita Ganguly, these defendants were not the architects of the scheme but merely players who profited from its implementation.

Unlike Ms. Ganguly, however, these defendants denied their guilt. They refused to accept responsibility for their actions or for the pain and anguish caused by their misdeeds. Instead, they forced the government to prove their guilt at a trial.

In our case, the conduct of Ms. Ganguly was wrong and she admitted that in open court.  Unlike the thousands of victims injured by the Madoff scheme, Ms. Ganguly will have to answer to only 4 victims.  (PSR:7).  This is not to imply that injury to these four victims is not serious or significant.  It is serious but it is important to note that there is no evidence that any of the victims of the scheme that was developed by Paul Phillips suffered the loss of their life savings.  None of our victims were forced into bankruptcy.  More importantly, however, the total amount of the loss attributed to Ms. Ganguly amounts to $5,409,750.  That is only one-tenth of the profits that Ms. Biongiorno took for herself.  Substantial, yes, but nothing compared to the astronomical losses of $65 billion caused by Madoff and his confederates and unlike the Madoff defendants, Ms. Ganguly openly accepted responsibility for her actions.

### 2. *United States v. Saquib Kahn, 13-Cr-00268 (RJD), E.D.N.Y.*

In another recent case in the Eastern District of New York, Saquib Kahn, a Staten Islander like Ms. Ganguly and a businessman with many political connections, pleaded guilty to all eight counts of an eight count information charging him with a large-scale check-kiting scheme that he designed to defraud 6 area banks out of over $5 million dollars.  On November 4, 2014, Mr. Khan was sentenced to 4 years probation and 1,500 hours of community service.   Mr. Kahn was the architect of the scheme and he personally carried it out.  Because of what he did, the Office of the United States Attorney asked the court to impose a sentence of 63 to 78 months imprisonment.  Instead, after listening to the arguments of counsel and hearing from Mr. Khan supporters, the court determined that the fair sentence, the just sentence and the sentence that was

"sufficient, but not greater than necessary, to comply with the purposes set forth in section 3553(a)(2)," was probation.

Unlike Mr. Khan who had a large number of supporters come forward on his behalf, Ms. Ganguly has only a few. But this Court should not focus solely on the number of supporters who come forward but on what these people have to say about her.

In addition, unlike Mr. Kahn, Ms. Ganguly was not the architect of the fraud and unlike Mr. Khan, Ishita Ganguly was not the main protagonist in the scheme that caused the losses to the victims. Ms. Ganguly is far less culpable than Mr. Kahn and as such, Ms. Ganguly is asking this court to impose a sentence similar to that which was imposed on Mr. Kahn.

**_C.  A Sentence to Reflect the Seriousness of the offense, to Promote Respect for the Law and to Provide Just Punishment for the Offense._**

While the defense concedes that Ms. Ganguly's crime is serious, it is no more serious than that of Saquib Kahn and it is far less serious than that committed by the Madoff defendants mentioned above. Saquib Kahn, a person who intentionally developed and personally carried a scheme to defraud banks of millions of dollars was sentenced to probation while Ms. Bongiorno will be sentenced to only a few more years than that recommended by Probation for Ms. Ganguly, despite taking more than $50 million dollars for herself in a scheme that deprived thousands of investors of their life savings.

Since the Judges in those cases imposed sentences that they believed reflected the seriousness of the crimes, promoted respect for the law and provided just punishment, in comparison, a sentence of probation for Ms. Ganguly certainly meets those criteria as well.

### D.  To Afford Adequate Deterrence to Criminal Conduct and to Protect the Public from Further Crimes of the Defendant.

As can be seen from the letters submitted in support of Ms. Ganguly, she is not an evil person.  She made a terrible error in judgment by taking money for herself that she should have invested.  Had she invested the money instead of believing in the promises of Paul Phillips and taking her profits before they were earned, she may not have even been arrested.  Instead she profited briefly from her indiscretion and now she faces the possibility of incarceration. Ishita will soon be rendered near penniless and will have to embark upon the arduous journey of having to rebuild her life.  She has lost face amongst her friends and her remaining family members.  Her remorse is genuine and it is complete.  As Dr. Krueger reported, the risk of Ishita engaging in future criminal behavior is low.  This court should have no fear of any recidivism by Ms. Ganguly, as it will not occur.  Ishita Ganguly has already suffered greatly and it is clear that she will never again engage in any form of criminal behavior.

### E. The Extent of Ishita Ganguly's Involvement and Her Efforts to Make the Victims Whole.

As discussed above, Ishita Ganguly became involved in this scheme as a result of the charming and persuasive tales of Paul Phillips.  Although she initially believed in the claims of Mr. Phillips, Ishita Ganguly brought this prosecution upon herself by her improper diversion of funds.  This is something she would never have done had she not believed that her investors were going to reap rich profits upon the conclusion of the investment scheme.

As some proof of this, Ms. Ganguly used her own name when dealing with the investors.  She provided the investors with own her personal phone number that she still uses today.  She never made any attempt to conceal her identity or hide the funds.  She used her own name, address and phone number when she opened the Astute Partners bank accounts into which the money of the investors was deposited.  These acts are some evidence that she was not consciously intending to defraud the investors.

While she may not have made a decision to permanently deprive these people of their funds, like a lawyer who takes funds from a client in the hopes of paying that client back before the client learns of the diversion, it is a theft nonetheless and thus Ishita has admitted her guilt.

Now, Ms. Ganguly will be left with no assets and no significant means of producing income at this time.[2]  This conviction will, in all likelihood, prevent her from ever obtaining employment in the real estate or financial industries and any attempt to obtain a decent job will present her with the problems that all convicted felons face.  All of her personal possessions are being sold off in order to pay off the debts she has incurred as a result of her unlawful conduct.  Her house has been seized as part of the forfeiture agreement, as well as bank accounts that she controls.  She is a person who has been through a lot in her life but has never before intentionally tried to injure or steal from another human being.  As she told Probation Officer James Mullen, "I feel terrible about my conduct.  I will do everything and anything to fix what I have done.  I want to make things right.  I'm responsible for this.  I want to right my wrongs.  I am very sorry."

Ms. Ganguly's remorse is genuine and her desire to see that the investors are restored to the positions they held before her misappropriation of the funds is real and the undersigned implores the court to consider this when imposing sentence.

Her crime is a serious one.  A sentence must be imposed to promote respect for the law and to provide just punishment.  But as the court stated in *Gall v. United States,* 128 S.Ct. 586 (2007), a probationary sentence imposes a significant restraint on the liberty of a defendant, and can satisfy the requirements of Title 18 U.S.C. §3553(a), *Gall at 595-596,* and as Dr. Richard Krueger opined in his report, her very low scores on the

---

[2]  Although Ms. Ganguly has not been employed since her arrest on this matter, she has developed, on her own, significant computer coding skills that have enabled her to work as a freelance iPhone applications game designer. (PSR:11).  Attached as Exhibit G is a list of iPhone, iPad and Android game apps developed by Ganguly in the past year, which she publishes under her own name and under the name of Revolution 3000, LLC.  Although these game have yet to produce any significant revenue, Ms. Ganguly hopes that continued development and exposure in this field will, one day, provide her with sufficient income that will allow her to pay back the victims while simultaneously providing her with a lifestyle where she will not have to rely on friends or the government for any support.  Incarcerating Ms. Ganguly at this time will separate her from this rapidly developing field and may result in irreversible harm to her attempts at developing this business in the future.

Hare Psychopathy Checklist and on the Level of Service/Case Management Inventory,

[show that] her risk for recidivism is very low.


### F.  In this Case, Incarceration is Not Necessary to Accomplish the Purposes of Sentencing As Set Forth in 18 U.S.C. 3553(a)(2).


Ms. Ganguly is a 5 foot 7 inch, 170-pound young woman who has never been involved in anything like this before.  She has psychiatric and alcohol issues that she is being treated for at the present time.  She has expressed sincere remorse and a strong desire to repay her victims, who, it is very likely will be reimbursed in full provided she is able to sell all of her possessions and work on her new business venture developing game apps.  In the opinion of Dr. Krueger, the risk of any recidivism is very low.  More importantly, based on the letters of support and all of the foregoing, it is clear that Ms. Ganguly is really a good and decent person who suffered from a lapse in judgment because of the emotional and financial pressures then present in her life.  Based on who she really is, the risk of Ishita Ganguly engaging in any criminal conduct in the future is nonexistent.

Incarceration will not accomplish any more than what can be accomplished through a period of probation.  In fact, incarceration may do more harm than good.  It has the potential to harm the victims, as it will certainly make it more difficult for them to be reimbursed.  Incarceration will certainly be harmful to Ms. Ganguly because of her physical stature and her psychiatric condition, which will make it very difficult for her to handle all that is involved in a prison environment.  Incarceration will clearly disrupt and

possibly end Ms. Ganguly's fledgling business that has the potential for significant growth thereby providing the revenue to fully repay the victims.  Upon completion of any period of incarceration, she will be returned to society without the possibility of any meaningful employment and without the financial means to start up her business again.

In this case, incarceration is clearly not necessary to accomplish the purposes of sentencing as set forth in the United States Code.  A period of probation, however, is clearly sufficient to accomplish those purposes and in fact may prove to be more beneficial to the victims, to Ms. Ganguly and thus, our society as a whole.

It is therefore respectfully requested that a non-custodial sentence be imposed on Ms. Ganguly.


### G.  Confinement, If Required, to Be at FPC Alderson, West Virginia.


While it is the position of the defense that a sentence of probation would be appropriate, if this court determines that a period of incarceration must be imposed, then it is then respectfully requested that the Court sentence Ms. Ganguly to a period of no more than 15 months incarceration.  For someone of Ms. Ganguly's physical stature and psychiatric make up, such a sentence would seem to be substantially more than what is necessary to comply with the purposes set forth in Section 3553(a)(2) but it would be of sufficient duration to satisfy any requirement of incarceration.

In addition, if a sentence of incarceration is imposed, it is requested that the defendant be allowed to serve it at the minimum-security facility, FPC Alderson in West Virginia.  This is a minimum security female facility that has a Residential Drug

Treatment Program that will assist her in dealing with the issues she has related to alcohol abuse, as was recommended by Dr. Krueger. *See, Exhibit D, p. 7.*

It is also respectfully requested that if Ms. Ganguly is sentenced to a period of confinement, then the report of Dr. Krueger, attached hereto as Exhibit F, accompany Ms. Ganguly to whichever facility she is assigned so that his diagnosis and his prescription of necessary medications can be communicated to the appropriate people at that institution so that Ms. Ganguly's health and welfare will not be adversely impacted.

### *H.  Voluntary Surrender*

Finally, should this Court determine that a period of incarceration is warranted, it most respectfully requested that Ms. Ganguly be permitted to surrender voluntarily.  Ms. Ganguly has never once had any problems in regards to reporting to probation or complying with the conditions of her release and the Probation Office views her as a suitable candidate for voluntary surrender.

**CONCLUSION**

For all of the foregoing reasons, Ishita Ganguly respectfully requests that the Court impose a sentence on her that is just and proper and Ms. Ganguly contends that such a sentence is a non-custodial sentence.  If, however, this Court determines that it must impose a sentence of incarceration, then, in the alternative, Ms. Ganguly contends that a sentence of 15 months is more than sufficient to fulfill the purposes of sentencing.

Dated: New York, New York
       February 3, 2015

Respectfully submitted,

_____
**THOMAS A. TORMEY, JR. (TT9669)**
140 Broadway
46th Floor
New York, New York 10005
*Office:* (212) 480-3910
*Fax:*    (212) 480-5051
*Email: T.Tormey@TormeysLaw.com*